Sandra A. GROSS, Plaintiff-Respondent,

v.

LLOYDS OF LONDON INSURANCE COMPANY, a foreign cor-
poration, The Experimental Aircraft Association,
Inc., a Wisconsin corporation, Imperial Casualty &
Indemnity Company, a foreign corporation, and
Milwaukee County, Defendants-Respondents,

Dr. Ivan D. FRANTZ, Defendant and Third-Party
Plaintiff-Appellant,

PIPER AIRCRAFT CORPORATION, Third-Party
Defendant-Respondent.†

Court of Appeals

*No. 83–664. Submitted on briefs January 19, 1984.—*
*Decided March 9, 1984.*
(Also reported in 347 N.W.2d 899.)

† Petition to review granted.

For the defendant and third-party plaintiff-appellant Dr. Ivan D. Frantz the cause was submitted on the briefs of *Kasdorf, Dall, Lewis & Swietlik, S.C.*, with *J. Ric Gass* of counsel, of Milwaukee.

For the defendant-respondent Imperial Casualty & Indemnity Company the cause was submitted on the briefs of *Mulcahy & Wherry, S.C.*, with *Mark A. Peterson* of counsel, of Milwaukee.

Before Wedemeyer, P.J., Decker and Moser, JJ.

DECKER, J.   Dr. Ivan Frantz (Frantz) appeals from an order allowing Imperial Casualty and Indemnity Co. (Imperial) to deposit with the trial court a check representing the limits of Frantz' liability coverage thereby relieving Imperial of its prospective defense of a claim made against Frantz, and dismissing Imperial from the lawsuit. Frantz contends that his coverage by Imperial was without monetary limit, an argument we conclude is meritless. He further argues, under various theories, that it was error for the trial court to allow Imperial to

escape defending the suit by paying the policy limits into court. We are persuaded that the particular policy language here allows Imperial to tender the monetary limit and avoid defense and that this is not contrary to public policy. We therefore affirm.

On August 5, 1982, at the Experimental Aircraft Association's Annual Fly-In in Oshkosh, Frantz' airplane rolled into a tent occupied by Sandra Gross, seriously injuring her.

Six days earlier, on July 30, Frantz submitted to Imperial a renewal of policy form, labelled a "conditional insurance binder," which stated limits of liability for bodily injury at $100,000 for each person. The policy itself, along with the declaration sheet, was subsequently issued on August 11, 1982. Two months after the accident, Imperial sent a check for $100,000 to Gross' attorney, who refused to accept it and filed a lawsuit for $11,000,000.

On December 3, 1982, Imperial filed a motion in the trial court seeking an order permitting Imperial to pay its policy limits into court. This motion was granted, and the trial court dismissed with prejudice all claims and cross-claims against Imperial. This appeal ensued.

Frantz first argues that, because the declaration sheet had not been issued at the time of the accident, Imperial is therefore liable to pay " 'all sums' of damages which arose out of the accident." We find no merit in this argument.

Frantz' argument, which is without citation to any authority, contends that the policy guarantees to "pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages . . . ." The beginning of that very sentence, however, states: "Imperial Agrees with the insured, named in the declarations made a part hereof, in consideration of the payment of the premium and in reliance upon the state-

ments in the declarations and subject to the limits of liability, exclusions, definitions, conditions and other terms of this policy to afford those of the following coverages as specified in the declarations . . . ." If one were to apply Frantz' logic one step further, it would appear that, without the declaration sheet, there is no named insured and therefore no one for Imperial to be liable to.

More persuasive, however, is the conditional binder signed by Frantz on July 30. This document specifies the policy limits to be set and, with respect to liability coverage, is identical to the declaration sheet issued on August 11. It is obvious from the binder that what was bargained for was a $100,000 liability limit for each person. As noted by Imperial, the coverage of the binder was the same as that of the expired policy. We therefore reject Frantz' contention that, for the period between the signing of the binder and the issuance of the declaration sheet, Imperial's liability was boundless. *See Terry v. Mongin Insurance Agency*, 105 Wis. 2d 575, 580–81, 314 N.W.2d 349, 352 (1982).

Frantz next contends that the defense provisions of the policy are vague, ambiguous, and require Imperial to defend to final judgment or settlement and that the trial court's interpretation of the provisions are against public policy. We address these three issues jointly and conclude that there was no error in the trial court's interpretation and implementation of the policy language.

The real question is whether, under this policy language, an insurance company may avoid defense of its insured by tendering a sum equal to the policy limits to the court. We conclude that where, as here, the policy clearly and unambiguously allows the insurer to do so, the insurer is absolved of its duty to defend and that such a circumstance is not contrary to public policy.

■

We look first at the salient terms of the policy. The first sentence of the policy, the beginning of which has been quoted above, continues in pertinent part, as follows:

and the Company shall defend any suit alleging such bodily injury or property damage and seeking damages which are payable under the terms of this policy, even if any of the allegations of the suit are groundless, false or fraudulent; but the Company may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements or after such limit of the Company's liability has been tendered for settlements. (Emphasis added.)

Frantz argues that the underscored language is vague and ambiguous. He contends that the term, "settlement," throughout this section refers to settlement of suit against the insured, not the insurer; and that it means an offer and acceptance of that offer. We perceive nothing in the term itself that lends itself to Frantz' first distinction. As to the second, while "settlement" does commonly signify both offer and acceptance, the policy language, which distinguishes between "payments of . . . settlements" and money "tendered for settlements," belies that distinction.

It is plain that, by accounting for both settlement payments and settlement tenders, the policy envisioned both accepted and unaccepted settlement offers. Frantz' reading of the provision strains both logic and the language itself; it requires the policy to distinguish between two kinds of settlements, each of which would entail successful offers and acceptances. In the first, the insurer's liability ceases when the claiming party has actually been paid, ("limit . . . has been exhausted by payment

of . . . settlements") ; in the second, the liability ceases when the insurer tenders payment of an agreed-to settlement ("limit . . . has been tendered for settlements."). This is a distinction without a difference. Moreover, this reading results in the first of those contingencies being superfluous; if liability ceases upon tender, there is no need to reassert that it again ceases upon payment, or the acceptance of that tender.

Therefore, even were we to regard the provision as ambiguous, we would avoid Frantz' construction as one which would render the phrase, "exhausted by payment of . . . settlements," meaningless. *See Wilke v. First Federal Savings & Loan Association*, 108 Wis. 2d 650, 657, 323 N.W.2d 179, 182 (Ct. App. 1982).

We do not, however, find the provision in question ambiguous.[1] We are convinced that the plain meaning of it allows an insurer to tender the policy limit to the court, having unsuccessfully attempted to tender it to the plaintiff.

Having determined that the policy allowed Imperial to pay the policy limit into court, we now must consider whether such action is proper and not contrary to public policy. This is apparently a question of first impression in Wisconsin.

Those jurisdictions in which this question (and the closely related question of extinguishing of the duty to defend upon depletion of the policy limit by judgment) has been addressed are sharply divided.[2] The major

[1] We reject Frantz' correlative argument that the term, "tendered for settlements," as intended to apply solely to multiple claims. We fail to understand why a single settlement for the policy limit must be a "payment of . . . settlements" while multiple claims need only be "tendered for settlements." Again, this reading strains the plain language of the provisions.

[2] *See, e.g., Conway v. County Cas. Ins. Co.*, 442 N.E.2d 245 (Ill. 1982) [and cases cited therein]; *Kocse v. Liberty Mut. Ins. Co.*, 387 A.2d 1259 (N.J. Super. 1978) [and cases cited therein]. *See also* Annot., 27 ALR3d 1057 (1969).

premise of those cases forbidding insurers from avoiding the duty to defend is the proposition that the duty to defend is broader than the duty to pay.[3] It is evident, however, that the origin of this doctrine derives not from any exhaustion of policy limits or settlement clause, but from the obligation of an insurer, under standard liability policy language, to defend "groundless, false and fraudulent" suits. 7C J. Appleman, Insurance Law and Practice § 4684 (W. Berdal rev. ed. 1979). It is also worthy of note that, in older liability policies, the duty to defend clause and the exhaustion of policy limits/settlement clauses were in separate sections of the policy. *See, e.g., American Casualty Co. v. Howard,* 187 F. 2d 322, 327 (4th Cir. 1951); *St. Paul Fire and Marine Insurance Co. v. Thompson,* 433 P. 2d 795, 798–99 (Mont. 1967).

As Appleman points out in a different context: "The 1966 and subsequent revisions [of liability policies] have tried to clarify the problem by incorporating the duty to defend into the insuring agreement and by providing that the duty to defend ceases after the limits are exhausted either by payment of judgments or settlements." Appleman, *supra* at § 4682 at 29. Although Appleman notes that "[s]ome courts have held, prior to the 1966 and subsequent revisions, that once the limits of liability have been exhausted, there was no further duty to defend," *id.* at 34 [footnote omitted], he further opines:

Despite the 1966 and subsequent revisions, the primary insurer may not walk away from the insured by paying relatively low limits into court and abandon the insured with a substantial judgment simply because the cost of appeal or other handling may be formidable. The insured's interests may demand continued protection despite threatened exhaustion of the primary limits. *Id.* at 36 [footnote omitted].

[3] *See, e.g., Colton v. Swain,* 527 F.2d 296, 301–02 (7th Cir 1975) [applying Illinois law].

It is apparent, however, from reading Appleman that the above caveat addresses itself to policies lacking the particular "tendered for settlements" language at issue here, language which we read to be sufficiently clear to put an insured in this situation on notice that payment of the policy limits into court will absolve the insurer of his duty to defend. The presence of this phrase in the policy, coupled with the substantial policy limit involved here, makes Appleman's warning inapplicable to the case before us.

Many, if not most, of the cases called to our attention by both parties place significant emphasis on the particular policy language as the real measure of an insurer's duty to defend. No reported case, to our knowledge, construes language absolutely identical to that found here. While similar in other respects, no previously construed policy includes what we believe to be the crucial "tendered for settlements" language.

Even those cases which held this or similar practices impermissible point to the importance of the particular policy language. In *Simmons v. Jeffords,* 260 F. Supp. 641 (E.D. Pa. 1966), while the federal court concluded, on the basis of different language than that found here, that the policy limits could not be deposited in court because the policy itself was clear and unambiguous, *id.* at 641, the court went on to state that "[i]f [the insurer] intended to reserve the substantial right it now seeks, it ought to have done so in terms free of ambiguity." *Id.* at 642. Similarly, *Landando v. Bluth,* 292 F. Supp. 975, 977 (N.D. Ill 1968), in construing *Denham v. La Salle-Madison Hotel Co.,* 168 F.2d 576 (7th Cir.), *cert. denied* 335 U.S. 871 (1948) the leading case allowing payment of policy limits to terminate an insurer's duty to defend, states that "[t]he essential thrust of *Denham* is plainly that a court should consider the specific language in the particular contract at issue."

We are persuaded that the language of the policy before us clearly envisions the tendering of policy limits as a means of foregoing the insurer's duty to defend.[4] Here, the duty to defend is modified and qualified in the same sentence by the "tendered for settlements" language. Under the terms of this policy, then, the duty to defend is not broader than the duty to pay.

We must now examine the public policy aspect of this contract. The parties to an insurance contract may provide such provisions as they deem proper as long as the contract does not contravene law or public policy. *McPhee v. American Motorists Insurance Co.*, 57 Wis. 2d 669, 673, 205 N.W.2d 152, 155 (1973). The bulk of Frantz' public policy argument is premised upon the competing duties to pay and to defend, an issue we have already addressed at length. We conclude that there is nothing contrary to public policy in an insurer's explicit policy language which limits the duty to defend to the policy limits. Our supreme court has stated that a contract should be held unenforceable on public policy grounds only in cases free from doubt. *Continental Insurance Co. v. Daily Express, Inc.*, 68 Wis. 2d 581, 589, 229 N.W.2d 617, 621 (1975). We are unpersuaded that such is the case here.

Frantz further argues that the trial court's order allowing Imperial to pay the policy limits into court contravenes public policy for failing to specify what will happen to the remainder of the fund if Frantz' defense expenses are less than the policy limits. We have examined the trial court's dispositional order, which specifies what will happen to the money under the various possible results of this suit and notes that any remainder

---

[4] We are unpersuaded by Frantz' additional argument that the terms of the policy required Imperial to defend or settle, and believe that the above discussion adequately addresses this point.

"shall be distributed pursuant to further Order of this Court . . . ." There is nothing about this distribution plan which is contrary to public policy.

Finally, Frantz argues that the defense provisions of the policy fail to conform to Minnesota insurance law. Under his argument, the policy fails to conform in various respects to the readability of insurance policies law of Minnesota, ch. 72C. As to the applicable law governing the legality of a contract, the choice of governing law is basically a question of the intent of the parties; and, in the absence of evidence to the contrary, the law of the place of the making of the contract is presumed to be intended unless the place of performance is different. *Peterson v. Warren*, 31 Wis. 2d 547, 556, 143 N.W.2d 560, 563 (1966), *overruled on other grounds in Allen v. Ross*, 38 Wis. 2d 209, 156 N.W.2d 434 (1968). Here, both Frantz and Imperial agree that Minnesota law governs.[5]

We are cited to no Minnesota authority on the subject, save the statutory provisions themselves. We are unable to find Minnesota case law construing these provisions. Frantz' argument is that the "tendered for settlements" language violates the dictates of Minn. Stat. Ann. § 72C.06 (West 1984), requiring the use of understandable language and the avoidance of legal terms. He further argues that the policy violates Minn. Stat. Ann. § 72C.05 (West 1984), which requires a cover sheet and various boldface warnings. We note that, in all the statutes allegedly violated, the arbiter of the standards would appear to be the Minnesota Commissioner of Insurance, who, under the dictates of Minn. Stat. Ann. § 72C.10

[5] Imperial apparently contends that Minnesota law governs at least this issue. Frantz, while disputing the extent to which Minnesota law governs, at least contends that the Minnesota statutes on this issue are to be applied. We can only conclude that for purposes of this issue, the parties agree on the applicability of the Minnesota statutes.

(West 1984), either approves or disapproves a proposed policy. Part of the record before us is a letter from Imperial to the Minnesota Department of Insurance which bears the stamp "APPROVED Nov. 1, 1981 Minnesota Insurance Division By: E. Louis Valenti."

It is apparent from the statutes cited that the application of the statutory criteria is an administrative task entrusted to the Minnesota Commissioner of Insurance. The statutes put forth no penalty for violation, save disapproval by that commissioner. Given the commissioner's approval of this policy, the lack of independent statutory sanctions for violations and the lack of Minnesota cases construing this chapter, we view any alleged violations here as *de minimus* and will not void the contract on such ground.

*By the Court.*—Order affirmed.