ST. JOHN'S HOME OF MILWAUKEE, Plaintiff,

v.

CONTINENTAL CASUALTY COMPANY, and
Donald Stevens, d/b/a Stevens Associates,
Defendants,

ZIMMERMAN DESIGN GROUP, INC., and Knuth
Masonry, Inc., Defendants-Third Party
Plaintiffs,

BECKER CONSTRUCTION COMPANY, INC.,
Defendant-Third Party Plaintiff-Appellant,

AETNA CASUALTY INSURANCE COMPANY
and American National Fire Insurance
Company, Defendants-Third Party Defendants-
Respondents,

EMPLOYERS MUTUAL CASUALTY COMPANY,
Defendant-Third Party Defendant,

HERITAGE MUTUAL INSURANCE COMPANY,
and Robert Brust, Third Party Defendants.
[Case No. 87–2265.]

ST. JOHN'S HOME OF MILWAUKEE, Plaintiff,

v.

CONTINENTAL CASUALTY COMPANY, and
Donald Stevens, d/b/a Stevens Associates,
Defendants,

ZIMMERMAN DESIGN GROUP, INC., Defendant-Third Party Plaintiff,

KNUTH MASONRY, INC., Defendant-Third Party Plaintiff-Appellant,†

BECKER CONSTRUCTION COMPANY, INC., Defendant-Third Party Plaintiff,

AETNA CASUALTY INSURANCE COMPANY, and American National Fire Insurance Company, Defendants-Third Party Defendants,

EMPLOYERS MUTUAL CASUALTY COMPANY, Defendant-Third Party Defendant-Respondent,

HERITAGE MUTUAL INSURANCE COMPANY, Third Party Defendant-Respondent,

Robert BRUST, Third Party-Defendant. [Case No. 87–2468.]

Court of Appeals

*Nos. 87–2265, 87–2468. Submitted on briefs August 9, 1988.— Decided November 29, 1988.*

(Also reported in 434 N.W.2d 112.)

† Petition to review dismissed.

766

For the defendant-third party plaintiff-appellant Knuth Masonry, Inc. the cause was submitted on the briefs of *Pfannerstill & Camp* by *Mark M. Camp,* of Wauwatosa.

For the defendant-appellant Becker Construction Co. the cause was submitted on the briefs of *Howard, Peterman, Solochek, Grodin & Nashban, S.C.* by *James S. Grodin,* of Milwaukee.

For the respondent Aetna Casualty the cause was submitted on the briefs of *Churchill, Duback & Smith* by *John D. Bird, Jr.,* of Milwaukee.

For the respondent American National Fire Ins. Co. the cause was submitted on the briefs of *Gibbs,*

*Roper, Loots & Williams* by *John R. Hoaglund, Jr.,* of Milwaukee.

For the appellant Becker Construction Co. the cause was submitted on the reply brief of *Howard, Peterman, Solochek, Grodin & Nashban, S.C.,* by *James S. Grodin,* of Milwaukee.

For the defendant-respondent Employers Mutual Casualty Company the cause was submitted on the brief of *J. Ric Gass* and *Joseph J. Ferris,* with *Kasdorf, Lewis & Swietlik* of counsel, of Milwaukee.

For the third party defendant-respondent Heritage Mutual Insurance Company the cause was submitted on the brief of *Borgelt, Powell, Peterson & Frauen, S.C.* by *Reuben W. Peterson* and *Paul R. Riegel,* of Milwaukee.

Before Moser, P.J., Sullivan and Fine, JJ.

MOSER, P.J. This court has consolidated cases 87–2265 and 87–2468 for the purposes of this appeal.[1] In case 87–2265, Becker Construction Company, Inc. (Becker) appeals from a judgment of dismissal and an order granted to Aetna Casualty Insurance Company (Aetna) and American National Fire Insurance Company, now known as Great American Insurance Company (American), its comprehensive general liability (CGL) insurance carriers. In case 87–2468, Knuth Masonry, Inc. (Knuth), Becker's subcontractor in building St. John's Tower, appeals from an order granting partial summary judgment and an order granting summary judgment to Employers Mutual Casualty Company (Employers) and Heritage Mutual Insurance Company (Heritage), Knuth's CGL carriers. We conclude that neither case presented material

---

[1]*See* sec. 809.10(3), Stats.

issues of fact and that all insurers were entitled to summary judgment as a matter of law. Furthermore, we conclude that Knuth's insurance policies did not provide coverage for damage attributable to Knuth's installation of bricks provided by St. John's. We conclude that each of the four insurance companies had no duty to defend. Therefore, we affirm.

Both cases stem from the construction of St. John's Tower, a ten-story nursing home located on the east side of Milwaukee, Wisconsin. The Tower building project involved Zimmerman Design Group, Inc. (Zimmerman), design architect; Stevens Associates (Stevens), construction administrator; Becker, general contractor; and Knuth, masonry contractor. St. John's provided the brick, and Knuth furnished the labor, wall ties, mortar, weeps, flashing and other minor items incident to installation of the brick. The building was first occupied in the fall of 1979. After occupancy, problems developed with its masonry. St. John's sued Zimmerman, Stevens, Becker, Knuth and their respective insurers for damages, claiming breach of contractual obligation and negligence. Becker and Knuth brought third-party actions against their respective insurance carriers, claiming that their CGL policies obligated the carriers to indemnify them and defend them in the action brought by St. John's.

Aetna and American moved for summary judgment dismissing them from the action on the basis that the CGL policies afforded Becker no coverage. Alternatively, Aetna and American moved for partial summary judgment to limit the scope of damage which St. John's could claim against them. Heritage and Employers moved for summary judgment on St. John's amended complaint and dismissal from Knuth's third-party complaint.

769

Aetna relied on the following policy language:

The company will pay on behalf of the insured all sums which the insured shall become legally obliged to pay as damages because of
> bodily injury or
> property damage

to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

Exclusions

. . . .

(k) to property damage to

(1) property owned or occupied by or rented to the insured,
(2) property used by the insured, or
(3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control;
but parts (2) and (3) of this exclusion do not apply with respect to liability under a written sidetrack agreement and part (3) of this exclusion does not apply with respect to property damage (other than to elevators) arising out of the use of an elevator at

770

premises owned by, rented to or controlled by the named insured;

(l) to property damage to premises alienated by the named insured arising out of such premises or any part thereof;

(m) to loss of use of tangible property which has not been physically injured or destroyed resulting from

 (1) a delay in or lack of performance by or on behalf of the named insured of any contract or agreement, or

 (2) the failure of the named insured's products or work performed by or on behalf of the named insured to meet the level or performance, quality, fitness or durability warranted or represented by the named insured;

but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the named insured's products or work performed by or on behalf of the named insured after such products or work have been put to use by any person or organization other than an insured;

(n) to property damage to the named insured's products arising out of such products or any part of such products;

(o) to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith;

(p) to damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of

the named insured's products or work completed by or for the named insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein.

American's CGL policy stated in part:

The company will pay on behalf of the insured all sums which the insured shall become legally obliged to pay as damages because of
 A. bodily injury or
 B. property damage

to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

Exclusions

This insurance does not apply:

(a) to liability assumed by the insured under any contract or agreement except an incidental contract; but this exclusion does not apply to a warranty of fitness or quality of the named insured's products or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner;

....

(m) to loss of use of tangible property which has not been physically injured or destroyed resulting from

 (1) a delay in or lack of performance by or on behalf of the named insured of any contract or agreement, or

 (2) the failure of the named insured's products or work performed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the named insured;

but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the named insured's products or work performed by or on behalf of the named insured after such products or work have been put to use by any person or organization other than an insured;

(n) to property damage to the named insured's products arising out of such products or any part of such products;

(o) to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith;

(p) to damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the named insured's products or work completed by or for the named insured or of any property of which such products or work form a part, if such products, work or property are

773

withdrawn from the market or from use because of any known or suspected defect or deficiency therein.

Employer's policy contained a "coverage" clause similar to those of Aetna and American, and it also contended the following exclusions were applicable to its coverage of Knuth's liabilities:

This insurance does not apply:

. . . .

(m) to loss of use of tangible property which has not been physically injured or destroyed resulting from

(1) a delay in or lack of performance by or on behalf of the named insured of any contract or agreement, or

(2) the failure of the named insured's products or work performed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the named insured;

but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the named insured's products or work performed by or on behalf of the named insured after such products or work have been put to use by any person or organization other than an insured;

(n) to property damage to the named insured's products arising out of such products or any part of such products;

. . . .

(p) to damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the

named insured's products or work completed by or for the named insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein.

The "Contractor's Endorsement" form in the Employer's policy also provided the following exclusion:

2. With respect to the Completed Operations Hazard to property damage to work performed by the Insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith.

And finally, Heritage provided coverage similar to that of the other three insurers, and contended that the following exclusions listed in its CGL policy were applicable:

This insurance does not apply:

. . . .

(m) to loss of use of tangible property which has not been physically injured or destroyed resulting from

(1) a delay in or lack of performance by or on behalf of the named insured of any contract or agreement, or

(2) the failure of the named insured's products or work performed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the named insured;

but this exclusion does not apply to loss of use of other tangible property resulting from the sudden

and accidental physical injury to or destruction of the named insured's products or work performed by or on behalf of the named insured after such products or work have been put to use by any person or organization other than an insured;

(n) to property damage to the named insured's products arising out of such products or any part of such products;

. . . .

(p) to damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the named insured's products or work completed by or for the named insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein.

The endorsement form also provided the following exclusion:

. . . .

(y) to property damage

(1) to property owned or occupied by or rented to the insured, or, except with respect to the use of elevators, to property held by the insured for sale or entrusted to the insured for storage or safekeeping.

(2) except with respect to liability under a written sidetrack agreement or the use of elevators to

(a) property while on premises owned by or rented to the insured for the purpose of having operations performed on such property by or on behalf of the insured,

776

(b) tools or equipment while being used by the insured in performing his operations,

(c) property in the custody of the insured which is to be installed, erected or used in construction by the insured,

(d) that particular part of any property, not on premises owned by or rented to the insured,

> (i) upon which operations are being performed by or on behalf of the insured at the time of the property damage arising out of such operations, or
>
> (ii) out of which any property damage arises, or
>
> (iii) the restoration, repair or replacement of which has been made or is necessary by reason of faulty workmanship thereon by or on behalf of the insured;

(z) with respect to the completed operations hazard and with respect to any classification stated above as "including completed operations," to property damage to work performed by the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith.

In response to the motions of the insurance carriers for summary judgment, the trial court ordered St. John's to itemize the damages for which it claimed the four carriers provided coverage. St. John's itemization of damages was as follows:

| | |
|---|---|
| Demolition of Brick | $125,909.00 |
| Demolition of Shelf Angles | $ 15,000.00 |
| Earthwork | $ 6,000.00 |
| Landscaping | $ 5,400.00 |

| | |
|---|---|
| Masonry Materials | $194,244.00 |
| Masonry Labor | $646,335.00 |
| Sealants | $205,616.00 |
| Indirect and Overhead Costs for Replacement Contract Including Architect Fees | $383,820.00 |
| Consulting and Investigation Costs | $ 92,955.00 |
| Additional Repair Costs | $ 43,203.00 |
| Consequential Damages | Unspecified. |

The trial court subsequently conducted hearings on the motions. By order of October 1, 1986, the court granted partial summary judgment to each of the four insurers after considering the oral arguments, insurance policies, complaints, responses, motions, supporting affidavits and memoranda of law from each of the parties. The court specifically held that with certain exceptions, "all items of claimed damage are defective work product or work performance by either Becker or its subcontractors or arise as a consequence of defective work product or performance" and are thus not covered by any of the four involved insurance policies. The court noted that the exceptions were the $6,000 claimed for earthwork and the $5,400 claimed for landscaping, which possibly were covered by the CGL policies of all four insurers. The court added that Employers and Heritage also provided potential coverage for the claims for $16,860, gypsum sheathing; $147, drywall and insulation; $3,681, bar stock; $17,633, brick cleaning; $413, Spancrete support and $950, cement plaster *if* these damages were caused other than by repair or replacement of defective work product or performance attributable to Knuth.

On October 29, 1986, Becker brought a motion to compel American and Aetna to defend on the basis

that the court found there was coverage, although limited. On November 17, American deposited $11,400 with the circuit court as tender to St. John's to cover its maximum potential liability for St. John's claims against Becker. Subsequently, both Aetna and American sought an order of dismissal.

On December 19, 1986, the trial court issued a decision on Becker's motion regarding American's and Aetna's duty to defend. The court reiterated that the CGL policies of Aetna and American could potentially cover only those claims against Becker relating to earthwork and landscaping. The court specifically noted that the other claims were "clearly not covered by the insurance contract" and "outside the scope of the policy." The court held that American and Aetna had no further duty to defend, and that dismissal would have been the appropriate remedy had St. John's accepted the tender of $11,400 ($6,000 earthwork plus $5,400 landscaping) by the companies. However, St. John's refused to accept tender, and asserted that an order of dismissal would complicate decisions regarding appeal, and that there were unresolved questions regarding costs and possible attorney fees. The trial court entered a temporary order suspending its requirement that American and Aetna participate in the balance of litigation. The insurers were not required to defend on behalf of Becker or participate on their own behalf as individual defendants. However, the court did reserve its decision on issues involving the costs of defense in the early stages of the lawsuit.

On May 18, 1987, the court granted summary judgment to Employers and Heritage. It noted that Aetna and American had deposited funds with the court to cover the $11,400 damages potentially cov-

ered by all four insurance policies, and it further noted that the miscellaneous items we discussed earlier were not covered by Knuth's CGL policies. Therefore, the trial court dismissed the claims against Employers and Heritage which involved the miscellaneous items. Furthermore, the court ordered that neither Employers nor Heritage had a duty to defend Knuth and excused them from participation in the trial.

Becker and Knuth each retained independent counsel. The case was tried and the jury returned a special verdict on June 19, 1987. It found that Zimmerman was negligent, that its negligence was causally related to St. John's damages, and attributed it with 92% of the liability; Knuth was not negligent; Becker was negligent, but its negligence was not causally related to St. John's damages; and Stevens was causally negligent, and attributed it with the remaining 8% of liability.

A judgment of dismissal was entered on November 5, 1987, dismissing all claims and cross-claims against American and Aetna. On October 27, the court also authorized St. John's to apply for disbursement of the $11,400 tendered by American.

Becker appeals from the November 5, 1987 judgment dismissing all claims against American and Aetna, and from the decision and order of December 19, 1986, which determined that neither insurer had a duty to defend Becker after they tendered the $11,400 to the court. Becker argues that even though the trial court determined their maximum potential liability under the CGL policies, and they deposited that sum with the trial court, American and Aetna still had a duty to defend Becker against the claims brought against it.

Knuth appeals from the order granting partial summary judgment entered on October 1, 1986, and from the order granting summary judgment to Employers and Heritage dated May 18, 1987. Knuth brings two issues before this court: (1) did the trial court err in excusing Employers and Heritage from defending Knuth after the trial court determined their maximum potential liability for St. John's damages; and (2) does the exclusionary section in each of Knuth's CGL policies cover the damages attributable to the brick furnished by St. John's and installed by Knuth?

## STANDARD OF REVIEW

Interpretation of an insurance contract involves a question of law.[2] An appellate court decides questions of law independently without deference to the decision of the trial court.[3] When construing an insurance contract, an objective test is applied.[4] The objective test requires that the policy be construed as it would be understood by a reasonable person in the position of the insured.[5] Furthermore, we will affirm a summary judgment if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

[2]*Shelley v. Moir,* 138 Wis. 2d 218, 222, 405 N.W.2d 737, 739 (Ct. App. 1987).

[3]*Ball v. District No. 4, Area Bd.,* 117 Wis. 2d 529, 537, 345 N.W.2d 389, 394 (1984).

[4]*Reserve Life Ins. Co. v. La Follette,* 108 Wis. 2d 637, 645, 323 N.W.2d 173, 176 (Ct. App. 1982).

[5]*Id.* at 645, 323 N.W.2d at 177.

law.[6] When reviewing a grant of summary judgment, we apply the same methodology as the trial court.[7] However, we owe no deference to the trial court's decision to grant such a motion.[8] Thus, we must independently review each of the claims brought before us by Becker and Knuth.

## INSURER'S DUTY TO DEFEND AFTER TENDER OF MAXIMUM POTENTIAL LIABILITY

Becker and Knuth both assert that their insurers had a duty to defend them against the claims brought by St. John's and any cross-claims for indemnification, even though the insurer's maximum potential liability of $11,400 for earthwork and landscaping had been tendered to the court. The core of Becker and Knuth's argument is that because the trial court determined that the insurers provided some coverage, although limited, the insurers were bound by the "coverage" clauses of their policies[9] to provide a defense.

This issue is one of first impression before this court, although the question of whether a duty to defend exists after tender of policy limits has been well litigated in Wisconsin and other jurisdictions. As the Louisiana Court of Appeal recently noted,

> A sharp division exists among jurisdictions over whether the duty to defend terminates upon exhaustion of the indemnity limits of the insurance policy [footnote omitted.] On one hand, courts

---

[6]Sec. 802.08(2), Stats.

[7]*State v. Mauthe,* 142 Wis. 2d 620, 624, 419 N.W.2d 279, 280 (Ct. App. 1987).

[8]*Wisconsin Elec. Power Co. v. California Union Ins. Co.,* 142 Wis. 2d 673, 677, 419 N.W.2d 255, 256 (Ct. App. 1987).

[9] Noted on pages 770 to 777.

have held, without regard to the language of the insurance policy, that the insurance carrier cannot absolve itself of the duty to defend by paying amounts up to the policy limits [footnote omitted.] These courts have held that the duty to defend is independent of the duty to pay. Generally, these courts disregard a defense clause of a policy that attempts to extinguish the duty to defend upon policy indemnification [footnote omitted.] The courts reason that, in situations in which the insured causes multiple injuries, the insurance carrier will pay the coverage limits to terminate the entire defense obligation [footnote omitted.] Therefore, to prevent an early escape by the insurance carrier, these courts hold that the duty to defend is independent and continues after exhaustion of policy limits [footnote omitted.]

Other courts, however, hold that the duty to defend is dependent upon the duty to pay [footnote omitted.] These courts hold that the insurance carrier does not have a duty to defend after the insurance carrier pays the maximum amount required under the insurance contract [footnote omitted.] According to these courts, the primary obligation imposed on an insurer is to indemnify the insured [footnote omitted.] The other obligations of the insurance carrier are designed only to implement the primary obligation of indemnification [footnote omitted.] Hence, the obligation of defense exists solely to better enable an insurance carrier to indemnify the insured.[10]

---

[10]*Pareti v. Pennsylvania Gen. Ins. Co.*, 519 So. 2d 225, 227 (La. Ct. App. 1988). *Cf. Brown v. Lumbermens Mut. Casualty Co.*, 369 S.E.2d 367 (N.C. App. 1988) (insurer's advance payment of policy limits did not discharge insurer's duty to defend the insured in the litigation of the suit because the policy was found to independently provide for liability limits and defense coverage); *Samply v.*

Wisconsin case law falls into the latter of these two categories. In this state, a liability insurer generally has a contractual duty to defend its insured in an action for damages,[11] and may be required to furnish a free defense to its insured prior to the determination of coverage.[12] An obligation to defend arises when the complaint alleges facts which, if proven, support liability covered under the terms and conditions of the policy.[13] However, when an insurer exhausts its liability by judgment or settlement, it discharges its obligation to the insured *in toto.*[14] In *Teigen,* the primary insurer moved for dismissal on the basis that it had met its obligation to its insured by obligating itself to extensive payments to the plaintiff under a structured settlement agreement. The plaintiff was to receive $130,000 in cash and an annuity of $260,000, which was less than the $500,000 policy limit. However, if the plaintiff lived to his normal life expectancy, he would have received $1,160,250, of which $600,000 was guaranteed. The Supreme Court upheld the trial

*Integrity Ins. Co.,* 476 So. 2d 79 (Ala. 1985) (insurer could not avoid its duty to defend by tendering payment of the limits of its liability without settlement prior to seeking withdrawal or without insured's consent); *Conway v. Country Casualty Ins. Co.,* 442 N.E.2d 245 (Ill. 1982) (insurer's payment of its policy limits, without more, does not excuse it from its duty to defend).

[11]*Mowry v. Badger State Mut. Casualty Co.,* 129 Wis. 2d 496, 527, 385 N.W.2d 171, 185 (1986).

[12]*Id.* at 528–29, 385 N.W.2d at 186.

[13]*Professional Office Bldgs., Inc. v. Royal Indemn. Co.,* 145 Wis. 2d 573, 580, 427 N.W.2d 427, 429 (Ct. App. 1988). Appellant Knuth's motion for the court to consider this case is hereby granted.

[14]*Teigen v. Jelco of Wisconsin, Inc.,* 124 Wis. 2d 1, 8, 367 N.W.2d 806, 810 (1985).

court's dismissal of the insurer, because the court concluded that the insurer carried out the terms of its insurance contract and fully protected itself and its insured from further exposure. Thus, there was no duty to defend once the policy was exhausted by payment of judgment or settlement.

This court and the Wisconsin Supreme Court have discussed the requirements an insurer must meet in order to discharge its obligation to defend in the case of *Gross v. Lloyds of London Ins. Co.*[15] Sandra Gross was injured when the plane of Dr. Ivan Frantz (Frantz) rolled into her tent. Frantz had an insurance policy with a $100,000 liability limit for each injured person, and a $300,000 limit for each occurrence. Frantz's insurer investigated the accident, and concluded that Gross' damages could greatly exceed $100,000. As a result, the insurer deposited with the trial court a $100,000 check representing the limits of its liability coverage. In upholding the trial court's dismissal of the insurer from the suit, this court noted that when an insurance policy clearly and unambiguously allows the insurer to avoid the defense of its insured by tendering a sum equal to the policy limits, the insurer is absolved of its duty to defend and such a circumstance is not contrary to public policy.[16] Gross petitioned for review and the Wisconsin Supreme Court reversed on the ground that at the time of the accident, Frantz had not yet received the policy and nothing in the record showed that Frantz had notice of his insurer's right to terminate its defense upon

---

[15] 118 Wis. 2d 367, 347 N.W.2d 899 (Ct. App. 1984), rev'd and remanded, 121 Wis. 2d 78, 358 N.W.2d 266 (1984).

[16] *Gross,* 118 Wis. 2d 367 at 375, 347 N.W.2d at 903.

tender of policy limits for settlement.[17] The supreme court also held that any limitation on the insurer's duty to defend is in the nature of an exclusion, and thus the defense coverage clause must clearly express the limitation.[18] Therefore, in order for an insurer to fulfill its duty to defend by tendering payment which exhausts the liability limit of its policy, the termination must

1. occur after a determination of coverage and potential liability;

2. involve an exhaustion of the policy limit by payment of a judgment or settlement;

3. satisfy the terms of the policy;

4. not be contrary to public policy; and

5. not be in bad faith.

Finally, the insured must have been given notice of the insurer's right to terminate. We conclude that these principles cannot be applied to situations where the insurer's maximum potential liability is determined by the trial court, and where said liability does not exhaust policy limits.

In the case at hand, the trial court's October 1, 1986 and December 19, 1986 orders determined that the "maximum potential liability" of Aetna and American, by virtue of the terms of their respective policies, was $11,400 for earthwork and landscaping. This order was in error because the policies excluded liability for these and any other claims resulting from repair or replacement of defective work products, or

---

[17]*Gross,* 121 Wis. 2d at 88, 358 N.W.2d at 271.
[18]*Id.*

from defective work performance. The trial court was further incorrect in holding that if the insurers paid the sum of $11,400, they owed no duty to defend. If an insurer owes any money at all under its insurance policy, it must defend, because Wisconsin is one of those states which requires an insurer to exhaust its total policy limits before it is freed from the duty to defend. Thus, an insurer in Wisconsin is not freed from the duty to defend until after it pays the maximum amount required under the insurance contract. We conclude that "maximum potential liability" cannot be equated with "maximum policy limits," and therefore a duty to defend exists even though an insurer tenders its "maximum potential liability" as American did here. While the above orders were incorrect, the trial court was ultimately correct in that it granted judgment dismissing all claims against Aetna and American on November 5, 1987. We therefore affirm that order dismissing Becker's duty to defend claims and cross-claims against Aetna and American as they are excluded under the insurers' respective insurance policies.

For the same reason we reject the trial court's reason for dismissing Knuth's claimed duty to defend because of the payment of $11,400 as the "maximum potential liability" of Employers and Heritage by way of partial summary judgment on October 1, 1986. We do so because both Employers' and Heritage's policies protecting Knuth specifically exclude coverage for defective work product or defective work performance, and thus there was no duty to defend Knuth in this suit. However, we affirm the trial court here because it was ultimately correct in granting both Employers and Heritage summary judgment against Knuth's duty to defend claim in its May 18, 1987 order.

We also hold that the trial court was incorrect when it authorized St. John's to apply for disbursement of the $11,400 tendered by American. This money should be returned to American because Aetna, American, Employers and Heritage owed no money for earthwork or landscaping. This is so because of the exclusions in each of their respective policies. We thus affirm the summary judgments granted by the court because it was ultimately right for the wrong reasons.[19]

## CGL COVERAGE OF THE DAMAGE ATTRIBUTABLE TO THE MATERIALS FURNISHED BY THE OWNER AND INSTALLED BY THE INSURED

The final issue presented before us involves whether Knuth's CGL policies covered the damage attributable to the brick furnished by St. John's and installed by Knuth. Knuth argues that the finished brick veneer wall of St. John's Tower was not its finished work product because Knuth furnished only the labor, mortar, ties and other items, and not the brick itself. However, there was no allegation or proof that the bricks were defective per se. Instead, St. John's alleged that Knuth performed the job of building the brick veneer in a negligent fashion. The trial court held that the fully constructed wall was a product of Knuth's labor and materials, and we agree. It is well-established that the "business risk" of faulty workmanship does not give rise to coverage under

---

[19]*See State v. Alles,* 106 Wis. 2d 368, 390, 316 N.W.2d 378, 388 (1982).

CGL policies in Wisconsin.[20] Knuth's negligence in its masonry work would clearly have fallen into the "work performed," or "business risk of faulty workmanship" exclusion. Therefore, Knuth's CGL policies did not cover the damages which may have resulted from faulty construction of the brick veneer wall, and we affirm the October 1, 1986 grant of partial summary judgment on the issue of coverage for said damages.

*By the Court.*—Judgment and orders affirmed.

FINE, J. (concurring). I join in the Court's determination that the Comprehensive General Liability policies issued to Knuth Masonry did not cover damages resulting from its faulty construction of the brick veneer wall.

I concur, in the result only, in the majority's decision to affirm the trial court's grant of summary judgment against both Knuth Masonry, Inc. and Becker Construction Company, Inc. on the "duty to defend" issue. Specifically, I agree with the trial court's analysis as set forth in its December 19, 1986 written decision where it distinguishes *Gross v. Lloyds of London Ins. Co.,* 121 Wis. 2d 78, 358 N.W.2d 266 (1984), upon which the majority relies, from the circumstances presented here:[1]

> In *Gross* the insurance company paid into court the full extent of its policy limits and sought to be excused from defending the lawsuit. The Supreme Court found that the insurance contract called for a defense of the lawsuit in addition to the payment of the policy limits. The claims being asserted by

---

[20]*Bulen v. West Bend Mut. Ins. Co.,* 125 Wis. 2d 259, 263, 371 N.W.2d 392, 393–94 (Ct. App. 1985).

[1]The trial court's decision concerned Becker Construction but is also applicable to Knuth Masonry.

the plaintiff in *Gross,* however, were claims that were covered by the terms of the contract. There has now been a determination in this lawsuit that claims being asserted against Becker by the Plaintiff, other than the landscaping and earth work claims, were not covered by either insurance contract. The Supreme Court's decision in *Gross* cannot be stretched to include a situation which would require the insurance company to defend claims which not only are clearly not covered by the insurance contract, but also have been declared by the Court to be outside the scope of the policy. This is a very different situation than one in which the insurance company pays its policy limits and the lawsuit continues to be pursued on the same claims, exposing the insured to excess liability. The only reasonable conclusion that can be reached under these facts is that both Aetna and Great American have no further duty to defend Becker Construction Company during the remainder of the proceedings in this lawsuit.

*St. John's Home of Milwaukee v. Zimmerman Design Group, Inc.,* Case No. 658–175, December 19, 1986, 2–3.